28 N.J. Super. 9 (1953)
99 A.2d 825
ESTHER NOTKIN AND LOUIS NOTKIN, PLAINTIFFS-APPELLANTS,
v.
BROOKDALE GARDENS, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1953.
Decided October 21, 1953.
*11 Before Judges EASTWOOD, JAYNE and FRANCIS.
Mr. Harry Chasin argued the cause for the appellants (Messrs. Hyman W. Rosenthal and Max D. Forrest on the brief; Messrs. Marcus & Levy, attorneys).
Mr. James J. Langan argued the cause for the respondent (Messrs. Emory, Langan & Lamb, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
This is a landlord and tenant, personal injury, negligence action. At the conclusion of the trial the jury returned a verdict in favor of the defendant. Appellants seek a reversal of the consequent judgment, contending that the trial court erred in allowing the introduction of prejudicially incompetent evidence.
At the time in question respondent was the owner of a garden apartment development in Bloomfield, N.J. The development consisted of 20 two-story buildings, each building containing four apartments, two on each floor.
Esther Notkin was a tenant in one of the buildings. One entrance and exit way was provided for use in common by all four tenants. In leaving the building the tenant would go through a door to an exterior platform from which a series of steps led to the sidewalk.
On December 26, 1950 there was a three-inch snowfall in the area. On each succeeding day thereafter, including December 29, the day of the accident, some rain fell. However, according to the weather bureau report, on the day of the accident generally one inch of snow still remained. The evidence discloses also that on December 29 the rain was accompanied by freezing temperatures which produced an icy condition on the walking surfaces in the vicinity.
At about 7:45 A.M. Mrs. Notkin undertook to leave her building. The outside platform and steps were covered with *12 snow and ice, as they had been the previous day. There was neither salt nor sand on the surface. In stepping onto the first downward step, she slipped and landed on her back, receiving the injuries for which compensation was sought.
It appeared that the landlord had two superintendents in its employ to look after all 20 of these buildings, and in the allocation of work Buckman, one of them, was assigned to the Notkin building. Shortly after this accident, Buckman went to California and respondent's manager testified that his address was unknown. A third person, Bert Pearson, who said he worked under Buckman, was employed also around the place as a laborer. However, he admitted that Buckman did the work on appellants' dwelling, while he, Pearson, was occupied on other buildings.
Undoubtedly because Buckman was not available as a witness, respondent called Pearson and undertook to prove through him the procedure generally followed by the landlord around December 1950 in cleaning the premises after snow storms. At first, the trial court sustained an objection to this proof but later was persuaded to allow it.
The basis for the offer is not entirely clear from the record. Counsel informed the court that he wished to "give information as to the procedure of removing snow during snow storms * * *," although they had "no relevant knowledge of the actual facts" of the accident or any specific information as to "what was done about this particular snow storm." This colloquy took place between court and counsel:
"Are you offering proof of a standard system carried through?
Mr. Blake: The system that they used in that place during that time.
The Court: What precaution was taken covering that period of time?
Mr. Blake: It would be in a general manner, around the end of 1950. * * *
Mr. Forrest: Obviously it is not based upon personal knowledge. They may have a particular system; whether that particular system was put in force on that particular day in question, is another thing.
The Court: There is no proof at all that it was put in force on the day in question. I think, though, I will receive the testimony."
*13 Then Pearson was asked for the routine he would follow "during the period around 1950" and he answered:
"A. When he told me I would do it.
Q. What did you do?
A. We did sanding. First we shoveled it by hand and he was doing it with the plow.

* * * * * * * *
Q. All right now, did you do anything as a general routine with respect to stoops or the steps entering into the approaches to the apartments?"
Again, over objection, he was allowed to answer:
"A. Yes, we always sanded and cleaned the steps.
Q. Did you do anything about cleaning the steps before you sanded?
A. We took off as much ice as we could and then we put sand on the top of it.
Q. Was that the regular routine that you used at all times during 1950, and approximately around that time, for the cleaning of the snow and ice?
A. Yes.

* * * * * * * *
The Court: It is understood, so that our record will be accurate, what has just been shown is no evidence as to what was done with respect to the steps in this particular storm.
Mr. Blake: Yes sir, I concede, because I have no actual proof of that."
The manager of the development repeated that Buckman "was the man to clean the area where Mrs. Notkin was a tenant"; it was "his section." Thereafter, again over objection, he was permitted to answer a question as to the "routine to be followed in the cleaning of snow and ice from the premises on or about December, 1950." He said:
"The standard procedure is for all available men to start on ice and snow, whatever the condition may be, immediately upon arriving at the place of employment, at the development, and they are to continue on that until it is completely cleared * * *."
He was allowed to testify also that the men had permanent instructions to hire additional workers, if needed, in the event of a heavy snowfall.
*14 On this appeal, respondent seeks to justify the reception of the evidence on the theory that it tended to demonstrate an awareness of the duty the landlord owed to the tenants with respect to the maintenance of common passageways, and that it had undertaken to discharge that duty by establishing a rule or practice to be followed by its employees. Proof of consciousness of such a duty has no probative force; the law imposes the duty and every landlord is chargeable with knowledge of it. Likewise, evidence that a landlord had laid down a rule, or prescribed a general practice, to be followed by his employees in the discharge of the duty owed tenants, is incompetent in a situation like the present, because it is self-serving and does not tend to demonstrate what was, in fact, done on the particular occasion to which the inquiry specifically relates.
While the specific statement does not appear in the record, the impression given is that the trial court considered the evidence proper as establishing or tending to establish a custom or habit with respect to clearing snow and ice from the platform and steps of appellants' building, even though it did not constitute "evidence as to what was done with respect to the steps in this particular storm."
On this subject, Wigmore says:
"Of the probative value of a person's habit or custom, as showing the doing on a specific occasion of the act which is the subject of the habit or custom, there can be no doubt." (Vol. 1, § 92, p. 519 (3d ed.)
The law recognizes that a man is likely to do or not to do a thing, or to do or not to do it in a particular way according as he is in the habit of doing it. However, such recognition is associated with the exercise of care and caution by the courts in the admission of the proof. Wigmore explains the reason:
"There is much room for difference of opinion in concrete cases, owing chiefly to the indefiniteness of the notion of habit or custom. If we conceive it as involving an invariable regularity of action, there can be no doubt that this fixed sequence of acts tends strongly *15 to show the occurrence of a given instance. But in the ordinary affairs of life a habit or custom seldom has such an invariable regularity. Hence it is easy to see why in a given instance something that may be loosely called habit or custom should be rejected, because it may not in fact have sufficient regularity to make it probable that it would be carried out in every instance or in most instances. Whether or not such sufficient regularity exists must depend largely on the circumstances of each case." (Id. 520)
In the present case strangely enough the basic purpose for which such evidence is received ordinarily, namely, to show circumstantially that the snow cleaning was done on the particular occasion, appeared to be repudiated by respondent's counsel. And as we have said, the court likewise, at one point in the record, noted that the proof was not evidence of performance of the specific act on the day of the accident. If such a state of the record were beyond question, then the reason for the operation of the rule did not exist and the proffered proof was immaterial.
However, despite the remark of the court and the seeming disclaimer of counsel, considering everything that was said, the impression is inescapable that respondent was endeavoring to have the jury draw the inference that the custom was pursued before the accident. So we will deal with the problem on that assumption.
In our own State, the rule allowing proof of custom or habit seems to be conditioned upon a showing of corroborating circumstances indicating that the custom had been followed in the particular instance. Cook v. Phillips, 109 N.J.L. 371, 162 A. 732 (E. & A. 1932); cf. Anno. 86 A.L.R. 544.
The facts introduced here tended to establish that the landlord had adopted a practice or a rule to be followed by its employees with respect to removing snow after storms. Of itself, this material had no probative tendency toward demonstrating the fact in issue, that is, whether the snow had been cleared, or cleared with due care prior to the accident.
Moreover, habit or custom to be evidential ought to relate to the actor whose conduct is in question. Here, Buckman *16 was charged with the duty of clearing snow from the premises involved. No one testified to his habit or custom, or whether he regularly followed and obeyed the employer's rule as to removal. Nor were any facts adduced to show, or from which an inference could be drawn, that he followed the rule or the custom after the snowstorm referred to.
Under the circumstances, we consider that it was error to permit the proof to be introduced.
Respondent argues that the evidence was not prejudicial. R.R. 1:5-3(b). But, as already indicated, some of the statements of counsel and the query of the court as to whether respondent was "offering proof of a standard system carried through," as well as the absence of any specific explanation to the jury in the charge or otherwise as to the reason for the reception of the proof, coupled with the nature of the proof itself, might very well have led the jury to the conclusion that the snow had been removed, and removed properly, from appellants' platform and steps after the snowstorm in question. Also, it might have led to the sequential conclusion that the snow, having been removed by plow and shovel, and the platform and steps having been sanded, the fall was not caused by snow covered with ice, but rather by the freezing rain which was falling when Mrs. Notkin undertook to leave the house. In our judgment, therefore, sufficient harm appears.
The judgment is reversed and a new trial ordered.